John A. Bruegger (SBN # 250494)
Justin R. Parafinczuk (*PHV forthcoming)*
**PARAFINCZUK WOLF, PA**
1 Sansome Street, Suite 1400
San Francisco, CA 94104
Tel.: (954) 462-6700
Fax: (954) 462-6567
jbruegger@parawolf.com
jparafinczuk@parawolf.com
vga@parawolf.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| RUDY MCWILLIAMS,<br><br>        Plaintiff,<br><br>v.<br><br>EPIC GAMES, INC.,<br>ROBLOX CORPORATION,<br>JOHN DOES 1-50, and<br>JOHN DOE CORPORATIONS 1-50,<br><br>        Defendants. | COMPLAINT FOR DAMAGES<br><br>1.  Strict Product Liability-Design Defect<br>2.  Strict Product Liability-Failure to Warn<br>3.  Negligent Design<br>4.  Negligent Failure to Warn<br>5.  Intentional Misrepresentation<br>6.  Negligence-Ordinary<br>7.  Intentional Misrepresentation<br>8.  Negligent Misrepresentation<br>9.  Fraud<br>10. Punitive Damages<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

-1-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff RUDY MCWILLIAMS files this Complaint for Damages and Demand for Jury Trial against Defendants EPIC GAMES, INC., ROBLOX CORPORATION, and JOHN DOES 1-50, and JOHN DOE CORPORATIONS 1-50, to recover damages, pursuant to and under the laws of the State of California, arising from the severe injuries sustained because of Plaintiff's use of Defendants' products. In support thereof, Plaintiff alleges and states:

## I. NATURE OF THE ACTION

1.     Many modern video games are fun and engaging adventures that allow individuals to immerse themselves in the world of games. This litigation is not a war on fun. Nor does it seek to curtail the creation and enjoyment of entertaining video games.

2.     Modern video games that are the subject of this litigation are not traditional arcade-style video games. Instead, the video game products subject to this litigation are created with "operant conditioning" to weaponize a video game for the unethical, reckless, and/or negligent application of this psychological technique to encourage a negative response as to the gamer and the positive outcome of increased revenue for the defendants. This litigation seeks to hold each Defendant accountable for its use of behavioral modification systems for which it did not warn nor provide appropriate safeguards, instead exposing minors to the known risks associated with continuous and excessive video game product use for the sake of increased profits.

3.     Each Defendant enlisted licensed psychologists and psychiatrists to incorporate the Cognitive Behavior Therapy technique of operant conditioning into its video game products, thereby exposing minor children to the same psychological techniques used by casinos without adequate warning, contrary to the standards applicable to those licensed mental health professionals that require informed consent.

4.     Each Defendant is aware that the behavior modification systems it uses results in continuous and excessive use of its video game products.

5.     Each Defendant is aware that continuous and excessive use of video game products increases its revenue, as the more time a player spends its products, the greater the likelihood that player will make in-game purchases.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

6.    Each Defendant is also aware of the established science regarding video game addiction[1] and supporting that prolonged use of video games, particularly by minors, can result in detrimental physiological and psychological impacts that manifest in impaired brain development and function, cognitive decline, disordered behavior, and other physical and emotional deficits.[2]

7.    One such condition, Internet Gaming Disorder ("IGD"), comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

8.    Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market Roblox and Fortnite as "educational" despite being fully aware of these risks, and marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

9.    Rather than mitigate the risks to minors, Defendants employed subversive operant conditioning behavior modification systems and marketed their video game products to children without introducing safeguards such as parental controls, age verification, warnings, or limitations on time or money spent in-game.

10.    While Defendants have profited from the addiction and disordered behavior caused by behavior medication systems they employ, generating billions of dollars of profits, the gamers — particularly minors — have been left to bear the burden of the damages resulting from this public health crisis.

11.    Minors exposed to Defendants' behavior medication systems not only experience physical and psychological effects but also endure the resulting consequences including worsened academic performance, social and familial relationships, employment prospects, and employability, among other things.

12.    Roblox and Fortnite are often the first video game products children are exposed to, and

---

[1] MD Griffiths; Halley de Oliveira Miguel Pontes, *A History and Overview of Video Game Addiction*, The Oxford Handbook of Digital Technologies and Mental Health (Oct. 8, 2020) https://doi.org/10.1093/oxfordhb/9780190218058.013.2.

[2] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

thereby serve as the gateway, or catalyst, to the addiction cycle and disordered behavior.

13. As set forth more fully below, Plaintiff played Roblox and Fortnite beginning when he was a minor child. As foreseen and intended by each Defendant, Plaintiff's exposure to the behavior modification systems in the Defendants' products resulted in continuous and excessive game play which triggered the expected physiological and psychological results and resulted in a disordered relationship with, and addiction to, video games. As a result, Plaintiff suffers from severe emotional distress, anxiety, depression, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, and a drastic decline in his grades, which led to academic dismissal from school.

14. Through this lawsuit, Plaintiff seeks to hold Defendants accountable for their decisions to place profits over safety, which directly and proximately resulted in Plaintiff's significant harm.

## II. PARTIES

### A. PLAINTIFF

15. Plaintiff Rudy McWilliams is a citizen and resident of the State of Pennsylvania whose principal place of residence is Dingmans Fry, PA.

16. Plaintiff is twenty-three (23) years old at the time of this Complaint.

17. Plaintiff began playing video games and using Defendants' products at approximately nine (9) years old. Since that time, Plaintiff has used and/or continues to use Defendants' products at an increasing, uncontrollable, compulsive, and/or addictive pace. Plaintiff has been injured and damaged, and continues to be injured and damaged, as a result of his use of, and addiction caused by his use of, Defendants' defective products as a minor child.

### B. DEFENDANTS

**Defendant Roblox Corporation**

18. Defendant Roblox Corporation ("Roblox Corp.") is a Delaware corporation with its principal place of business at 3150 South Delaware Street, San Mateo, California 94403.

19. Roblox Corp. is a video game developer and publisher that, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, and/or prepared Roblox at their California office. Roblox Corp. also distributed, marketed and/or supplied

-4-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Roblox, either directly or indirectly, to members of the general public, including to residents of the State of Tennessee, including to Plaintiff.

20.     Roblox Corp. performs the majority of its development, sales, executive, and other essential business functions from its primary office in San Mateo, California. Roblox has maintained significant contacts with the state of California since its conception, including maintaining its headquarters in California since 2006.

**Defendant Epic Games, Inc.**

21.     Defendant Epic Games, Inc. ("Epic Games") is a Maryland corporation with its principal place of business at 620 Crossroads Blvd, Cary, North Carolina 27518.

22.     Epic Games is a video game developer and publisher who, at all times material hereto, designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Fortnite video game series and platform, either directly or indirectly, to members of the general public within the State of California and the State of Tennessee, including to Plaintiff.

23.     The true names and capacities of the Defendants, JOHN DOES 1-50 and JOHN DOE CORPORATIONS 1-50, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sues said Defendants by fictitious names and will ask leave of court to amend this Complaint to show their true names or capacities when the same have been determined. Plaintiff is informed and believes and thereon alleges that each of these fictitiously named Defendants are responsible in some manner for the occurrences alleged herein, and that Plaintiff's injuries and damages as alleged and set forth herein were proximately caused by such fictitiously named Defendants.

### III. JURISDICTION AND VENUE

24.     Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

25.     This suit alleges causes of action seeking relief arising under the laws of the State of California, including but not limited to the allegation that as a direct and proximate result of the Defendants' products described above and Defendants' negligent, deceptive, willful, immoral, reckless, and unlawful actions and inactions, representations and misrepresentations, including by omission,

-5-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff suffered and continues to suffer injuries and damages. Plaintiff has suffered and continues to suffer both injuries and damages that exceed the sum or value of $75,000, exclusive of interest and costs.

26. This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332(a) because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.00.

27. This Court has general personal jurisdiction over Defendant Roblox Corp. because Roblox Corp. has its principal place of business in this District and because its continuous contact with this District renders it "at home" in this District. Defendant Roblox Corp. maintains its principal place of business in the San Mateo County, California.

28. This Court has specific personal jurisdiction over Defendant Epic Games because it has established sufficient minimum contacts in, to, or with California because each transacted business in California and regularly conducted business in California from which it respectively derives substantial revenue. Epic does substantial business in the State of California and within the Northern District of California, advertises in this District, and receives substantial compensation and profits from their Products within this District. Furthermore, Epic purposefully and intentionally directed its activities to the residents of California, and purposefully and intentionally availed itself to the benefits and protections of the laws of the state of California, the market of the state of California, and continue to avail themselves in that manner. The controversy in this action is directly affiliated with, related to, and arises from Epic's contacts with the state of California such that the exercise of jurisdiction over Epic by this Court is consistent with traditional notions of fair play and substantial justice and is both reasonable and proper.

29. Defendants expected or should have expected that their business activities could or would have could or would have consequences within the State of California, as well as throughout the United States.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because, among other things: (a) each Defendant directed its activities at residents in this District; (b) each Defendant conducted substantial business in this District; (c) a substantial part of the counts giving rise to this action occurred in this District; and (d) Defendant Roblox is a resident of this District and citizen of this State.

-6-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

# IV. GENERAL FACTUAL ALLEGATIONS

## A.    OPERANT CONDITIONING AS A TRADITIONAL THERAPY

39.    The games subject to this litigation have incorporated techniques known in psychology as "operant conditioning." Operant conditioning is a type of psychological treatment also called **instrumental conditioning**, in which voluntary behaviors are modified by association with the addition (or removal) of reward or aversive stimuli. The frequency or duration of the behavior may increase through reinforcement or decrease through punishment or extinction.[3]



40.    The American Psychological Association adopted a Code of Conduct that recognizes and requires that legal informed consent is required to deploy operant conditioning, and behavioral psychologists must take reasonable steps to protect a patient or subjects individual rights and welfare.[4]

41.    Instrumental conditioning is psychological treatment traditionally used to address or treat excessive maladaptive behaviors that a patient wishes to extinguish such as smoking and overeating,[5] or alternatively to increase a behavior that is not occurring enough, such as eating enough, lack of focus to study and correcting lack of personal hygiene.

**Traditional Operant Conditioning**

42.    Ethical use of operant conditioning, in compliance with the APA Code of Conduct is used to reduce unwanted and undesirable behaviors, such as eating disorders, chain smoking, and autism treatment to extinguish negative behavior.[6]

---

[3] https://en.wikipedia.org/wiki/Operant_conditioning

[4] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

[5] https://www.ebsco.com/research-starters/health-and-medicine/operant-conditioning-therapies

[6] *Id*.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

43.     The problem behavior is first observed and recorded as it naturally occurs in a variety of settings, and no attempt is made to modify the behavior. The therapist may conduct the observation and record the behavior. This part of the behavior modification program, is called baseline observation, provides a record of where and when the behavior occurred including duration and intensity. Behavioral measures are often plotted on a graph to provide a visual record of behavior. The baseline data are used to define the problem or target behavior as precisely as possible. The client and therapist also define the desired changes in this target behavior and set up specific behavioral goals to be met during treatment.

44.     This degree of precision in behavior analysis is rarely found in traditional psychotherapy. Behavioral observation continues throughout the treatment phase of the behavior modification program and changes from the baseline level are recorded. Examination of this ongoing record of behavioral progress allows both therapist and client to evaluate the effectiveness of the treatment throughout the treatment process. If behavior is not changing in the desired direction or pace, the treatment program can be altered or adjusted.

45.     A licensed therapist must follow the applicable standards, including the APA Code of Conduct guidelines, in crafting an operant conditioning model to change a person's behavior which must include the informed consent of the subject patient that is having their own behavior modified.[7]

**Defendants' Reckless, Negligent and/or Unethical Application of Operant Conditioning**

46.     In contrast to traditional use of operant conditioning to extinguish negative behavior or promote positive behavior, the Defendants have utilized the unethical, reckless, and/or negligent behavioral psychologists to change human behavior by utilizing operant conditioning in game design, with the intent of promoting the dangerous and maladaptive behavior of "Continuous Video Game Play" without warning or obtaining the informed consent of parents, schools or gamers.[8]

47.     Ethical rules require knowledge, participation and informed consent of the subject whose behavior is being changed.

[7] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf

[8] *Id.*

-8-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

48. Defendants each employed licensed psychologists and/or psychiatrists to create operant conditioning behavior modification systems for their products without warning that such psychological techniques were being used or of the risks associated with that use, failing to obtain meaningful informed consent to exposure to these systems.

49. The use of operant conditioning in gaming goes beyond increasing sales. Instead, the application of operant conditioning is used with the primary goal of increasing sessions and length of time of video game play. The goal was continuous game play to the detriment of gamers.

50. Defendants, with the assistance of behavior therapists and psychologists, used beta versions of Roblox and Fortnite with children as game testers to incorporate operant conditioning behavior modification systems into their products' design to ensure the continuous play was achieved at game launch.

51. When an organization employs a behavioral psychologist, that psychologist still has a duty to do no harm.[9]

52. The psychologist hired by the Defendants had a conflict between their applicable standards, including the APA Code of Conduct, because the Defendants used the assistant of psychologists to elicit the behavior of continuous game play, which did harm many gamers and no steps were taken to inform gamers of the operant conditioning, the targeted behavior or protect the gamers from the harm of video game addiction.

53. APA Code of Conduct mandates that a conflict between organizational demands of a psychologists require acknowledgement of the conflict and "under no circumstances may this standard be used to justify or defend violating human rights."[10]

54. Likewise, the duty of care owed by each Defendant precludes violating human rights or facilitating the violation of human rights, particularly to increase profit.

55. Parents, gamers, and schools are not aware that operant conditioning is being used on the players and no steps, such as disclosure of operant conditioning, disclosure that the targeted behavior

---

[9] American Psychological Association: Ethical Principles of Psychologists and Code of Conduct (adopted August 21, 2002 effective June 1 2003); chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.apa.org/ethics/code/ethics-code-2017.pdf
[10] Id.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

was continuous play nor adequate tracking of game play hours was utilized in game design to protect gamers from the harm of addiction and the sequalae of addiction.

56.    In sharp contrast to traditional therapeutic uses of operant conditioning, the Defendants have used unethical, reckless, and/or negligent methods of creating negative maladaptive behaviors in children.

57.    The behaviors Defendants have sought to elicit do not pass muster under any applicable standards, including ethical standards binding on licensed therapists, because operant conditioning, intended to treat maladaptive behavior, was instead twisted to promote and increase maladaptive behaviors.

58.    The traditional operant conditioning procedures were inverted so that the behavior of gamers was studied and recorded to create excessive maladaptive behaviors, including but not limited to video game addiction, impulsivity, decreased ability to focus in class, inability to track or conceptualize time spent in a video game, inability to finish tasks and prioritize important tasks, and increased social isolation leading to anxiety and depression, increasing the suicide risk for extreme gamers.

59.    The behavior being reinforced in Roblox and Fortnite is continuous game play, which by ethical and social policy considerations is a negative behavior, especially in younger school-age children.

60.    Defendants monetarily incentivized the willing participation, and disregard of their ethical standards, of licensed psychologists in this reckless, negligent, and unethical abuse of treatment modality.

61.    Quoting an article published in the American Psychological Association:

> Psychologist Tim Nichols, PhD, loved video games as child. "Like any red-blooded American kid, I was playing on my Nintendo back in the 1980s and was a Sega guy in the '90s," he remembers. Now he gets paid to play. As "user research lead" at Microsoft Studios, Nichols is one of a growing number of psychologists in the video game industry. With the number of games and platforms exploding, companies that design and develop video games are increasingly turning to psychologists for help analyzing data and making sure their products are as effective as they can

-10-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

be. Some psychologists are even launching consulting businesses to assist game manufacturers or creating games of their own.[11]

62.     Upon information and belief, the APA with full backing by the Defendants and the Entertainment Software Association ("ESA") supported suppression and identification of video game addiction instead opting to call the addiction "Internet Gaming Disorder." This patient abandonment has led to a lack of diagnosis and treatment for children suffering from video game addiction.

**B.      OPERANT CONDITIONING BEHAVIOR MODIFICATION SYSTEMS IN GAMES.**

**Historical Development and Modernization of Video Games**

63.     The term "video game" is defined by California Civil Code §§ 1746-1746.5 as "any electronic amusement device that utilizes a computer, microprocessor, or similar electronic circuitry and its own monitor, or is designed to be used with a television set or a computer monitor, that interacts with the user of the device."

64.     Video games were first developed in or around the 1950s.

65.     Initially, games were only available to be played by the general public in arcades. Beginning in the 1970s, however, the first at-home video game devices ("consoles") appeared on the market.

66.     By the late 1990s and early 2000s, there were multiple at-home video game consoles, such as Xbox, PlayStation, and Nintendo's Wii, making video games easily accessible to most users from the comfort of their living room. Over the next ten years, video games moved to mobile devices and tablets, once again increasing accessibility to gameplay.

67.     Many video games – including Roblox and Fortnite – can now be played on multiple different consoles, mobile devices, and tablets.

68.     Moreover, video games can be delivered to these consoles, mobile devices, and tablets in several diverse ways, such as physical discs, digital downloads, school laptops, online gaming networks, and cloud gaming services.

---

[11] https://www.apa.org/gradpsych/2012/01/hot-careers; Rebecca Clay Video Game Design and Development: Video Game Companies are increasingly tapping psychologists' expertise to make games even more compelling, challenging and fun. American Psychological Association

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

69.    In 2024, there are 1.17 billion gamers online, and global gaming revenues are at least $176.06 billion.[12]

70.    As the sophistication of gaming devices and game delivery methods has increased, so too has the sophistication of the design of games themselves.

71.    Unlike their predecessors, many modern-day games are enormous in scale, providing countless hours of non-repetitive, unique gameplay that allows players to become immersed in the world of the game.

72.    The ways in which game developers monetize their games have also changed over time. In the past, game developers earned revenue primarily through the one-time sale of their games. Although some game developers still follow this model, others – including Defendants – allow their games to be downloaded for no or minimal cost and generate revenue through purchases made within the game.

73.    In-game purchases can include, but are not limited to, cosmetic customizations for the player's character (e.g., hats, uniforms, hair styles), "boosters" that help their character perform better or progress faster within the game, and "season passes" that allow players to access exclusive in-game content.

74.    Many of these in-game purchases are relatively low cost, leading to them being termed "microtransactions."

75.    In-game items available for purchase are often heavily advertised to players through means such as in-game pop-up advertisements during gameplay, loading screens while users wait for gameplay to start, and in-game stores.

76.    Many games also offer game-branded products such as toys, energy drinks, apparel, bedding, home goods, board games, and more.

77.    Game developers that offer their games at no or low cost, such as Roblox and Fortnite rely on these microtransactions to turn a profit. Indeed, the design and marketing strategy associated with such games is rooted, in part, in the theory that the revenue from the on-going microtransaction

---

[12] Jasmine Katatikarn, *Online Gaming Statistics and Facts: The Definitive Guide (2024)*, Acad. of Animated Art (Jan. 16, 2024), https://academyofanimatedart.com/gaming-statistics/.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

system will outweigh the revenue from a one-time-purchase game. That is because microtransaction spending can easily add up to hundreds, or even thousands, of dollars from an individual user.

78.    Accordingly, modern gaming companies are enlisting PhD behavioral psychologists and using research to implement programming into their games that will addict players with a goal of increasing the amount of playtime, thereby prolonging their exposure to in-game marketing for in-game purchases in order to improve the odds players will engage with microtransactions that generate profits for the game developer.

**C.    OPERANT CONDITIONING SYSTEMS AVAILABLE IN ROBLOX AND FORTNITE**

79.    Roblox uses a core gameplay loop to encourage continuous play. This involves repeatable, moment-to-moment actions like mining resources, crafting tools, and building structures. The player's decisions and accomplishments in each cycle provide a satisfying, immediate reward.

80.    The Roblox core loop uses behavior techniques of immediate fun engaging players within the first five minutes of gameplay. Then Optimal Pacing is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

81.    Fortnite was designed with numerous operant conditioning tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement.

82.    One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. This is an operant conditioning tactic used to reward the player when they win, and when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what topped them from winning was the smallest mistake. As a result, players are conditioned to keep trying under the mistaken belief that they are ever closer to winning.

**Rewards Reinforce Negative Behavior - Continuous Video Game Play**

83.    In the context of gaming products, rewards act as positive reinforcement, encouraging gamers to keep playing. Consider the satisfaction of leveling up, finding a rare item, or achieving a high score. Each of these milestones provides a reward, which triggers a dopamine release in the brain—the internal "feel-good" chemical. This surge of dopamine reinforces the behavior, making it more likely that a gamer will come back to the game in search of that same pleasure.[13]

84.    Famed psychologist B.F. Skinner's research on reinforcement also emphasized the power of variable rewards—rewards that come at unpredictable times or intervals. In his experiments with pigeons, Skinner found that animals were more motivated to perform a task when they were rewarded on a variable schedule rather than at regular intervals. This concept translates well to games, where rewards are often distributed unpredictably. Think of loot drops in adventure games or rare cards in a deck-building game. The uncertainty of when and what reward will be given keeps players engaged, eager to discover what's next.

85.    All Defendants built operant conditioning into their respective games by positively reinforcing and rewarding continued video gameplay time and punishing users when they do not play or otherwise fail to conform to the desired behavior of increased play time and increased purchasing of microtransactions.

**Game Flow Keeps Player Connected to the Operant Conditioning**

86.    When a game's difficulty level is balanced just right—not too easy, but not too hard—it can lead to what psychologist Mihaly Csikszentmihalyi calls the "flow state." This is a state of deep focus where the player is completely absorbed in the activity, often losing track of time.[14] Games use incremental challenges to create flow, gradually increasing difficulty to keep players in the zone, fully engaged but not overwhelmed. Achieving flow is inherently rewarding, encouraging repeat play as players seek to experience it again.

**Social Identity in Gaming—Operant Conditioning**

[13] Skinner, B. F. (1938). *The behavior of organisms: an experimental analysis.* Appleton-Century.
[14] Csikszentmihalyi, Mihaly. (1990). Flow: The Psychology of Optimal Experience.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

87. Games don't just offer individual rewards; they often fulfill social needs as well. Research has shown that social interactions in games, such as cooperation, competition, and team-based activities, are strong motivators for repeat play. According to Social Identity Theory, people derive a sense of self and belonging from their group affiliations.[15] When players form teams, clans, or guilds, they start to see themselves as part of a community, which encourages loyalty and continued participation.

88. In a survey conducted by the Entertainment Software Association (ESA) in 2024, 73% of U.S. gamers said they play games to connect with friends, while 73% noted that playing with others increases their enjoyment of the game (ESA, 2024). Social games that involve interaction with friends or online communities make the experience richer and more satisfying, which reinforces the desire to keep playing.[16]

**Psychology of Progress—Operant Conditioning Tool**

89. Games are known for their use of achievements, badges, and progress indicators—elements that symbolize advancement and status. These features draw on the Goal-Setting Theory, which posits that specific, challenging goals lead to higher performance and greater motivation.[17] When players see a clear path to progression, such as leveling up or earning achievements, they are motivated to reach those milestones, which enhances engagement and repeat play.[18]

**Badge Effect and Status**

90. Badges, trophies, and leaderboards add an additional layer of motivation by appealing to players' desire for recognition and status. Psychologists refer to this as extrinsic motivation—the drive to earn rewards or recognition from external sources.[19] This is particularly powerful in social games, where players can see each other's achievements, creating a sense of friendly competition. The desire to achieve status among peers often keeps players coming back, striving for new achievements and recognition.

[15] Tajfel, H., & Turner, J. C. (1979). An integrative theory of intergroup conflict. In W. G. Austin, & S. Worchel (Eds.), The social psychology of intergroup relations (pp. 33-37). Monterey, CA: Brooks/Cole.

[16] https://www.theesa.com/video-games-remain-lifelong-source-of-entertainment-for-190-6-million-americans/

[17] Locke, Edwin & Latham, Gary. (1991). A Theory of Goal Setting & Task Performance. The Academy of Management Review. 16. 10.2307/258875.

[18] *Id.*

[19] Deci, E. L., & Ryan, R. M. (1985). Intrinsic Motivation and Self-Determination in Human Behavior. New York, NY: Plenum.https://doi.org/10.1007/978-1-4899-2271-7

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**D.     CONTINUOUS VIDEO GAME PLAY ORIGINATING FROM OPERANT CONDITIONING RESULTS IN VIDEO GAME ADDICTION**

91.     Operant conditioning is a behavior modification system serving as the architecture of video game design that many of today's video games utilize. The use of operant conditioning towards a gamer can be one of the factors contributing towards video game addiction; operant conditioning is the strategy while video game addiction can be the by product or operant conditioning.[20]

92.     Once engaged in the game, the player sets asides their rules for their daily life and accepts the rules of the game as the new way to live life.[21]

**Attention Deficit Disorders Exacerbated with Video Game Addiction**

93.     A three-year longitudinal study by Gentile et al. demonstrated that the more time a child spends playing video games the more problems they have with attention span.[22] In fact, children with attention span problems such as ADHD, are more attracted to video games and find those kids neglect activities that would have otherwise demanded their control and attention such as homework, sports and household chores.[23]

94.     The sequalae of video game addiction causes anxiety, impulsivity, low self-esteem, poor school performance, emotional and social intelligence deterioration, social isolation, cognitive decline, exacerbation of ADHD, visual problems, seizures, orthopedic injuries, depression, addiction, orthopedic injuries from overuse injuries of controllers, suicide attempts and suicide.[24]

**E.     ABUSE OF OPERANT CONDITIONING TO INCREASE GAMEPLAY**

95.     By creating their games in this manner, Defendants' goal was not healthy gaming, but rather it has always been continuous video game play for profit.

96.     Defendants did not implement measures to allow parents and teachers to monitor and control video game play time. Parental controls are defective in most games.

---

[20] Daniel Vu. "An Analysis of Operant Conditioning and its Relationship with Video Game Addiction" ART 108: Introduction to Games Studies (2017).
[21] *Id.*
[22] Gentile D.A., Swing E.L., Lim C.G., Khoo A. Video game playing, attention problems, and impulsiveness: Evidence of bidirectional causality. Psychol. Pop. Media Cult. 2012;1:62–70. doi: 10.1037/a0026969.
[23] *Id.*
[24] Lérida-Ayala V, Aguilar-Parra JM, Collado-Soler R, Alférez-Pastor M, Fernández-Campoy JM, Luque-de la Rosa A. Internet and Video Games: Causes of Behavioral Disorders in Children and Teenagers. Children (Basel). 2022 Dec 31;10(1):86. doi: 10.3390/children10010086. PMID: 36670637; PMCID: PMC9856521.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

97.     Each Defendant is accountable for failing to warn that operant conditioning is being used in Fortnite and Roblox for the goal of continuous video game play. Additionally, Defendants failed to include available safeguards, such as accurate time tracking in cross platform, game sharing and educational versions, as well as defective and/or non-existent parental controls.

98.     Defendants' suppression of the diagnosis and treatment of video game addiction coupled with the failure to warn of continued video game play carried a risk of video game addiction and the sequalae flowing from the addiction demonstrates a reckless disregard for the safety and well-being of children, including Plaintiff.

99.     Furthermore, Defendants are aware that science has shown that prolonged use of video games by minors can result in lack of full development of the prefrontal cortex, cognitive decline, and inability to reach full educational potential.[25]

100.    Internet gaming disorder comes with a myriad of symptoms that include addiction, social isolation, depression, withdrawal symptoms that are often misdiagnosed as ADHD, exacerbation of ADHD and anxiety, all of which contribute to increased risk of suicide.

101.    Defendants knew of the risks of IGD and the other accompanying medical conditions yet continued to market their games as "educational" despite being fully aware of these risks, Defendants marketed their respective games and products to minors, even at most times without parental knowledge or consent in a school setting.

F.     **EXCESSIVE VIDEO GAME PLAY AND EFFECTS ON ADOLESCENT BRAINS**

102.    For almost two decades, research on the interaction between video game usage and the adolescent brain has shown that extensive usage has a severe impact on the adolescent brain, including loss of grey matter, which leads to severe physical and mental effects on the child. Many of these effects are indicators or consequences of IGD, which is the addiction to video gaming.

103.    One of the ways that the impact of video game usage is studied is research about the role dopamine plays in the brain during gameplay.

---

[25] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder,* 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

104.   Video games can and do cause an intense dopamine release in the user that is similar in magnitude to that experienced by substance abuse or gambling. Dopamine is a neurotransmitter made in the brain that acts as a chemical messenger that communicates messages between nerve cells in the brain, as well as between the brain and the body. Dopamine serves as the brain's all-important "reward center" and, in addition, plays a critical role in several body functions including attention, mood, pleasurable reward and motivation, sleep, learning, and movement. The release of dopamine causes demonstrable physical, mental, and emotional responses in the human brain and body. This is especially true in minors, and particularly neurodivergent minors, whose brains are still developing. Increased frequency of dopamine releases can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is made unavailable.

105.   Video game addiction has been suggested to be as addictive as heroin. [26]

106.   In minors, the creation of this level of dopamine high at such a young age is difficult to overcome.

107.   The repetitive release of dopamine creates, reinforces, and strengthens a dysregulated or dopaminergic neural pathway that propels the user to hyperfocus on using the video games more and more, first at an increasing rate and then with compulsive desire until the impulse to use the video games develops into a disordered use or addiction.

108.   This dopaminergic response triggers impulsive behaviors outside of the gaming world consisting of life-altering impulsivity and inability to control behaviors that can and do cause a myriad of catastrophic physical, mental, and emotional disorders, symptoms, and injuries, including other addictions, significant withdrawal symptoms, maldevelopment of the brain's frontal lobe, dissociative behaviors, social isolation, damage and/or negative consequences to cognitive processes, attention disorders, severe depression, morbid obesity, malnutrition and/or undernutrition, risk of suicide, risk of harming others and other harmful effects, all to the severe detriment and damage to the minor, and to the severe emotional detriment and pecuniary or economic damage to their families and caretakers. [27]

---

[26] https://abc13.com/post/fortnite-can-be-as-addictive-as-heroin-health-experts-say-/4410795/

[27] E. Suárez-Soto, A. Peris-de la Hoz, A. Sanchez-Fernandez-Quejo, E. Rodriguez-Toscano, N. Lagunas, B. Reneses, A. De la Torre-Luque, Problematic gaming use and psychological distress among Spanish young adults: A comprehensive study, The European Journal of Psychiatry, Volume 39, Issue 1,2025,100279, ISSN 0213-6163,https://doi.org/10.1016/j.ejpsy.2024.100279.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

109.    Additional research on the impact of video games reports physical changes to the brain and brain matter as a result of gameplay.

110.    Research has shown that prolonged use of video games affects the prefrontal cortex of the user, causing a loss of grey matter, lower cognitive function, and an inability to regulate impulse control. The operant conditioning techniques utilized in video games rewards impulsivity, which causes a lack of development in the prefrontal cortex. Instead, the regions of the brain that create impulsivity are overutilized and fed while executive function is starved leading to a lack of brain development in the prefrontal cortex. Research has also concluded that such use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction disorders.

111.    Clinical evidence has shown that users addicted to online games experience biopsychological symptoms and complications, including symptoms traditionally associated with substance abuse and addiction, such as hangovers, changes in mood, ability to adapt, withdrawal, conflict, and recurrence symptoms.

112.    Empirical studies indicate that gaming disorders are associated with detrimental health-related outcomes.[28]

113.    Brain imaging studies have shown that excessive use of video games negatively affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

114.    Other studies have shown that disordered and/or excessive use of video games leads to negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Gamers lack time awareness of how long they have played a game.

115.    During adolescence, the prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization. This region of the brain does not reach maximum capacity until the age of 25 to 30. The executive control center of the prefrontal cortex is essential to one's ability to healthfully weigh risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals. The lack of full development of the

---

[28] Pierpaolo Limone, Benedetta Ragni, Giusi Antonia Toto, The epidemiology and effects of video game addiction: A systematic review and meta-analysis, *Acta Psychologica*, Volume 241, 2023,104047, ISSN 0001-6918, https://doi.org/10.1016/j.actpsy.2023.104047.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

prefrontal cortex is arguably why young people are more likely to engage in hours of use while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes, minors are less able to weigh potential negative consequences and curb potentially harmful behavior like excessive use of video games, which further impacts frontal lobe development.

116.    Brain imaging studies related to IGD have shown structural changes in the brain, particularly a reduction in white-matter density (consisting mostly of cells and axons that transmit signals



from the cerebellum to other brain regions) and grey-matter volume (associated with emotions, perception, memory, and motor control). Specifically, studies showed several regions of the brain demonstrated reduction in grey-matter volume in gaming disorder participants, as depicted here:[29]

117.    Brain activation studies have shown that the use of video games causes changes in the reward and impulse control regions of the brain, and that engaging with video games activates regions of the brain in a manner similar to the way the brain is activated in response to cue-exposure to drugs (whereby addicts are exposed to relevant drug cues to extinguish conditioned responses).

118.    Additional brain activation studies have shown that individuals with gaming disorders have impaired inhibitions, and that video game cues activate craving, attention, and executive function



[29] Livny, Weinstein, and Weizman, *New Developments in Brain Research of Internet and Gaming Disorder*, 75 Neurosci. Biobehav. Rev. 314 (Apr. 2017).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

areas of the brain. Those cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain because of prolonged use of video games. Regions that showed activation in response to video game cues in gaming disorder participants in more than two studies are depicted in the following image:[30]

119.    Structural studies of the brain have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible because of changes in reward regions of the brain. One comparison study of young adults with a mean age of 24 revealed that individuals who engage in excessive use of video games tend to have lower cognitive function, particularly in areas of verbal ability and working memory.

120.    Research has shown that a neurodivergent minor with a diagnosis of Attention-Deficit Hyperactivity Disorder ("ADHD") or Autism Spectrum Disorder is at a higher risk of developing video game disorder or addiction, which can worsen one's ability to control impulsivity and result in brain damage.[31] Research has shown that while use of video games may foster creativity in some minors, such potential benefits are outweighed by the risk of developing addiction or disordered use of video gaming products, which typically develops swiftly in minors and neurodivergent individuals. This is particularly true when video games incorporate addictive and manipulative tactics, as well as other problematic psychological programing.

**G.    GAMING ADDICTION IS A RECOGNIZED AND DIAGNOSABLE CONDITION**

121.    Addiction to and disordered use of video games and internet gaming is a recognized, diagnosable mental disorder and form of behavioral addiction codified by the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5).[32] The diagnostic symptoms of internet gaming disorder currently set forth in DSM-5 include: (1) preoccupation with playing and/or using video games; (2) withdrawal symptoms (sadness, anxiety, irritability, and/or other unpleasant symptoms) when access to play and/or use is removed, precluded, or reduced; (3) tolerance

---

[30] Aviv Weinstein et al., *Neurobiological Mechanisms Underlying Internet Gaming Disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).

[31] Micah O. Mazurek & Christopher R. Engelhardt, *Video Game Use in Boys with Autism Spectrum Disorder, ADHD, or Typical Development*, 132 Am. Acad. of Ped. J.L. 2 (2013).

[32] It is also recognized in the recently released Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSM-5-TR).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

- the need to spend more time playing and/or using video games to satisfy the urge and desire to do so; (4) loss of control or the inability to reduce video game playing and usage time and/or unsuccessful attempts to quit gaming; (5) giving up other activities or loss of interest in previously enjoyed activities due to compulsion to play video games; (6) continuing to play and use video games despite negative or problematic consequences; (7) deceiving family members or others about the amount of time spent playing and/or using video games; (8) using video games to "escape" or relieve negative moods, such as guilt or hopelessness; and (9) jeopardized school or work performance or relationships due to playing and/or using video games.

122.    Nationally recognized institutions such as the Cleveland Clinic and the National Center for Biotechnology Information (NCBI) also recognize video game addiction and categorize the addiction as falling under the general category of IGDs.[33]

123.    As of 2022, "Gaming disorder"—disordered use of and/or play with video games—is a recognized mental health disorder by the World Health Organization and International Statistical Classification of Diseases and Related Health Problems. "Gaming disorder" is included within the subcategory "ICD-11" entitled "Disorders due to substance use or addictive behaviors."[34] "Gaming disorder" is defined in the 11th revision of the International Classification of Diseases as a pattern of persistent or recurrent gaming behavior, specifically "digital gaming" or "video-gaming," which may be online or offline, manifested by: impaired control over gaming (e.g., onset, frequency, intensity, duration, termination, context); increasing priority given to gaming to the extent that gaming takes precedence over other life interests and daily activities; and continuation or escalation of gaming despite the occurrence of negative consequences.

**H.    AMOUNT OF TIME PLAYED CORRELATES TO SEQUALAE OF VIDEO GAME ADDICTION**

---

[33] Shabina Mohammad, Raghad A Jan, & Saba L Alsaedi, *Symptoms, Mechanisms, and Treatments of Video Game Addiction*, Cureus (Mar. 31, 2023).
[34] Other disorders found in that subcategory include alcoholism and gambling addiction.

-22-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

124. One study showed positive bioelectrical prefrontal activity during gaming tasks of healthy gamers between the ages of 8 and 12 who limited game play to 20 minutes.[35]

125. In contrast, a similar study of unhealthy gamers with an IGD diagnosis showed a thinner cortex in the brain with a smaller volume of gray matter.[36] The reward-related network and the IGD gamers inhibition system were altered, the orbitofrontal cortex and anterior cingulate cerebral area were overstimulated, similar to a drug addiction.[37]

126. Recently, a study by Kwak et al. longitudinally compared 14 adolescents with internet gaming disorder to 12 professional internet gaming students who practiced for about ten hours a day, within a defined support system that included practice, physical exercise, lectures on team strategy, rest and mealtimes.[38] After one year, both groups showed increased brain activity within the attention system of the parietal lobe. However, professional gamers improved problematic behaviors, impulsivity, aggression, depression and anxiety, while adolescents with internet gaming disorder showed no behavioral improvement and a dysfunctional brain activity within the impulse control network in the left orbitofrontal cortex.

## I.    ADDICTIVE GAME DESIGN FEATURES CAUSE SIGNIFICANT HARM TO MINORS

127. The human population most vulnerable to the combination of game developers' microtransaction methodology and addictive operant conditioning design features are minors; minors who are neurodivergent are even more susceptible to becoming addicted. Video game developers, including Defendants, knew this, but nonetheless purposefully designed their games and platforms to exploit that vulnerable population, causing injury and detriment, including to Plaintiff. Doing so has

[35] Mondéjar T., Hervás R., Johnson E., Gutiérrez-López-Franca C., Latorre J.M. Analyzing EEG waves to support the design of serious games for cognitive training. *J. Ambient Intell. Humaniz. Comput.* 2019;10:2161–2174. doi: 10.1007/s12652-018-0841-0.

[36] Lee D., Park J., Namkoong K., Kim I.Y., Jung Y.-C. Gray matter differences in the anterior cingulate and orbitofrontal cortex of young adults with Internet gaming disorder: Surface-based morphometry. J. Behav. Addict. 2018 doi: 10.1556/2006.7.2018.20

[37] Smirni D, Garufo E, Di Falco L, Lavanco G. The Playing Brain. The Impact of Video Games on Cognition and Behavior in Pediatric Age at the Time of Lockdown: A Systematic Review. *Pediatr Rep.* 2021 Jul 14;13(3):401-415. doi: 10.3390/pediatric13030047. PMID: 34287345; PMCID: PMC8293336.

[38] Kwak K.H., Hwang H.C., Kim S.M., Han D.H. Comparison of Behavioral Changes and Brain Activity between Adolescents with Internet Gaming Disorder and Student Pro-Gamers. *Int. J. Environ. Res. Public Health.* 2020;17:441. doi: 10.3390/ijerph17020441

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

yielded the intended results: video game developers, including Defendants, have earned extraordinary financial revenue from this group of users as a result of placing their addictive products that are targeted to minors into the stream of commerce.

128. Each Defendant knew or was aware, or should have known and should have been aware, that their respective products were dangerous and harmful to users, particularly minors, when used as intended and in a reasonably foreseeable manner. In fact, each Defendant intentionally caused and designed their respective products to most effectively cause users with developing brains to become addicted or disordered in their desire to use the products. To that end, upon information and belief, each Defendant employed behavioral psychologists and/or neuroscientists to develop products that incorporated design features premised upon psychological tactics engineered to keep users engaged in using the products for longer and longer periods of time.

129. The microtransactions and other technologies, designs, features, mechanisms, algorithms, artificial systems, programs, and other processes each Defendant incorporated into their products were implemented in a manner such that users (and, when users are minors, their caretakers) do not understand and have no way of understanding (or uncovering through reasonable diligence) that their use of the products involves engagement with intentionally addictive design features that are physically damaging to their brains and bodies, and financially rewarding to the Defendants.

130. There is no meaningful disclosure of the addictive mechanisms and microtransactions in each Defendant's products at the time they are purchased and/or downloaded to allow prospective users to make informed decisions as to whether using the products are desirable, appropriate, safe, or worth the potential risk.

131. At all times material hereto, each Defendant targeted consumers/purchasers, including minors, and specifically including Plaintiff herein, to use their respective products and engage in microtransactions whereby in-game perks are exchanged for real money through in-game targeted solicitations.

132. Each Defendant, with knowledge of Plaintiff's age and without regard to other neurodivergent traits or social factors, targeted Plaintiff with manipulative programming to prolong use of their products in hopes of inducing Plaintiff to engage in microtransactions during their use of the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

products. As a result of Plaintiff's use of each Defendant's products, and because of the addictive design features incorporated into the products, Plaintiff suffered addiction, social isolation, depression, anxiety, loss of friends and relationships, and damage to his grades, resulting in an academic dismissal from school.

**J.      SPECIFIC OPERANT CONDITIONING METHODS USED BY DEFENDANTS**

<u>**ROBLOX CORP.**</u>

**Roblox Gameplay Basics**

133.    Roblox is a video game and platform that was developed and published by Roblox Corp. The game was released in September 2006.

134.    At present, Roblox has approximately 111.8 million daily active users.[39]

135.    More than 45% of the consumers playing Roblox are under age 13.[40]

136.    Roblox is available to play on gaming consoles, computers, tablets, and cellular devices.

137.    Roblox is an online game that is free to download and play, making it easily accessible to all users, including minors.

138.    Individuals that wish to play Roblox must create a Roblox account.

139.    In order to create a Roblox account, individuals must include a birth date, username, and password.

140.    Users of any age can create a Roblox account, though users cannot enter a birth date for any year after 2020. Roblox Corp. does not require users to verify their age when creating a Roblox account. Accordingly, users can represent that they are younger or older than their actual age.

141.    Users are also not required to obtain parental consent to create a Roblox account nor to play Roblox.

142.    Roblox Corp. created the online currency "Robux," which can be obtained by (a) purchasing it with real currency; (b) receiving recurring stipend given to users with a Roblox Premium membership; and (c) earning it from selling "game passes" or "developer Products" to other Roblox platers.

---

[39]  Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).
[40]  The Roblox Corp. Homepage, https://corp.roblox.com/ (last visited Sept. 29, 2025).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

143. Robux sales, and the revenue generated therefrom, increase as the number of active daily and active monthly Roblox users increases.

144. Roblox has hosted over 3.7 billion virtual transactions on its platform.

145. Roblox Corp. admits in public filed documents that it has the ability to "dynamically apply relevant content filters, anti-addiction rules, payment limits, parental; consent requirements, and certain other regional requirements."[41]

146. For example, the games available to any particular user will vary based upon the age they entered when generating their account and what games Roblox's algorithm recommends to the users, and games can be restricted using ID verification requirements.

147. In November of 2024, Roblox Corp. announced, "major updates to [its] safety systems and parental controls." It claimed these updates were implemented because "safety is and always has been foundational to everything [it does] at Roblox.

148. The changs Roblox Corp. made in 2024 included changes to viewable content for each age group, parental controls for minor's screen time usage, and a new minimum age at sign up.

149. April of 2024, Roblox Corp. implemented further updates to parental controls, stating that "[s]afety underpins everything we do at Roblox, particularly the safety of our youngest users." These 2025 updates included the ability for parents to view their minor's top Roblox games the minor has played and how long the minor spent in each game for the past week. Parents can now also block specific games and experiences for their minors.

150. Until 2024, Roblox Corp. did not provide parental controls for minor's screen time and usage in Roblox. Roblox Corp. could have allowed parent-imposed time limits but instead chose not to allow parents to set time limits on their minor's Roblox account for over eighteen years of operation.

151. Until approximately September 2024, Roblox Corp. allowed users to represent their age as young as one year old and have access to virtually all content on the platform. Even now, parents whose minors are over the age of 12 cannot set restrictions on spending limits, set time limits, change

---

[41] *Earning on Roblox*, Roblox Creator Hub, https://brands.roblox.com/resources/activating-on-roblox-the-virtual-economy (last visited Sept. 29, 2025).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

privacy settings, or manage friends and communication on their minor's account. Roblox Corp.'s changes to parental controls in 2025 did not address these failures to protect and limit minor users.

152. Until 2025, Roblox Corp. did not provide guardians with the ability to block specific games and experiences, nor for guardians to view how much time their minor spends in each respective game.

153. The implementation of these restrictions and changes by Roblox Corp. in 2024 and again in 2025 demonstrates its understanding of its responsibility to implement such restrictions and safety measures, and further, demonstrates how easily Roblox Corp. can implement restrictions and safety measures in general. The changes that Roblox Corp. implemented in 2024 and 2025 did not require game by game review by Roblox. Corp., but instead were implemented as system-wide updates.

154. Despite its ability to implement anti-addiction rules, specific parental controls, payment limits, and restrictions, upon information and belief, Roblox Corp. instead chooses not to implement those restrictions in order to increase its profit.[42]

**Roblox is Marketed to Minors Yet Lacks Adequate Safety Features**

155. Roblox Corp. does not inform users that operant conditioning techniques were used to elicit the targeted behavior of continued video game play which posed a risk of develop internet gaming disorder and the injuries that correspond to IGD.

156. Instead, Roblox Corp. provides users, potential users, and guardians false assurances of safety.[43] For example, Roblox Corp. states that:

    a. it has "built a platform with safety at the foundation;[44]

    b. it "spend[s] hundreds of millions of dollars each year to meet [its] safety mission;[45]

---

[42] See Roblox Corporation, Form 10-Q (May 1, 2025), p. 68 (https://www.sec.gov/ix?doc=/Archives/edgar/data/0001315098/000131509825000118/rblx-20250331.htm ("...[R]equirements for verified parental consent before allowing children to create an account may limit the use of our Platform or reduce our overall demand for our Platform, which would harm our business, financial conditions, and results of operations").

[43] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Sept. 29, 2025).

[44] Matt Kaufman, CFO, Driving Civility and Safety for All Users, https://corp.roblox.com/newsroom/2024/07/driving-civility-and-safety-for-all-users (last visited Sept. 29, 2025).

[45] *Id.*

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

c.    users should "learn about how Roblox's commitment to safety and civility helps students grow;[46]

d.    it "strive[s] to make [its] systems as safe as possible by default, especially for [its] youngest users;[47]

e.    its age recommendations for its product are "grounded in child development research and informed by industry standards, essentially confirming its reliance on scientific research about adolescent development and content consumption;[48]

f.    its recommendations are created by "examin[ing] global industry standards and consult[ing] child development experts;[49]; and

g.    its product is part of the "[n]ew era of teaching and learning," and teaches educators how to "pilot Roblox in [their] class or school district," assuring parents, educators, and students that its product is safe for use of all ages.[50]

157.    While Roblox does feature some parental controls in its product, almost all of these parental controls can only be applied to minors' accounts if the minor is under 13, despite Roblox Corp.'s alleged desire to create one of the safest online environments.

158.    Roblox Corp. states on its website that:[51]

▼ First, get the go-ahead

If you're under 13 years old, please get permission from your parent or guardian to use Roblox. You shouldn't use our Services without their go-ahead.

159.    Roblox Corp. could, but does not, allow any users to set self-imposed time limits on their Roblox account.

**Roblox Corp.'s Monetization of Intentionally Addictive Game Design**

---

[46] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).

[47] Naren Koneru, Eleonore Vonck, Open Sourcing Roblox Sentinel: Our Approach to Preemptive Risk Detection (Aug. 7, 2025), https://corp.roblox.com/newsroom/2025/08/open-sourcing-roblox-sentinel-preemptive-risk-detection.

[48] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/31247519953172-Experience-Controls (last visited Sept. 29, 2025).

[49] Content Maturity Labels, Roblox, https://en.help.roblox.com/hc/en-us/articles/8862768451604-Content-Maturity-Labels (last visited Sept. 29, 2025).

[50] Education, Roblox, https://education.roblox.com/ (last visited Sept. 29, 2025).

[51] Roblox Privacy and Cookie Policy, Roblox, https://en.help.roblox.com/hc/en-us/articles/115004630823-Roblox-Privacy-and-Cookie-Policy (last visited Sept. 29, 2025).

-28-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

160.    Roblox Corp. designed the game-creation aspect of its product to allow users to create their own Roblox video games for play and purchase by other Roblox users, including minors.

161.    Though third parties create many of the games, upon information and belief, Roblox Corp.'s own in-house developers also create games for users to play.

162.    Roblox Corp. profits from all monetary transactions that occur within these created games, whether created internally by Roblox Corp., or created by third-party users.

163.    Roblox Corp. constructed a "Creator Hub" on its website. The Creator Hub provides users with instructions (including "how-to" videos) from Roblox Corp. on how users can create their own Roblox games and also provides users with tools that enable or facilitate creation of their own Roblox games.

164.    Users that create their own games are referred to as "creators" or "developers." Upon information and belief, some the creators or developers include child psychologists and/or were designed with the assistance of child psychologists.

165.    Roblox Corp.'s website boasts that its top ten developers made, on average, $33.9 million in 2024.[52]

166.    Roblox Corp. reports its developers have been collectively paid $3.3 billion since 2018.[53]

167.    Beyond working with developers to create additive games, Roblox Corp. purposefully designed other features within its product to intentionally addict users.

168.    Roblox Corp. designed an achievement system within Roblox that rewards users for completing various tasks or actions. These achievements are not based upon a user's time or actions within a third-party game "experience," but rather the user's time and actions on Roblox's platform itself. For example, a user playing Roblox can unlock an achievement for playing Roblox for three days in a row, ten days in a row, and twenty days in a row. Likewise, users can earn an achievement for playing Roblox for an hour. When the user unlocks an achievement, they can see what percentage of other users have unlocked the achievement. This system is designed to keep users engaged with the

---

[52] https://corp.roblox.com/newsroom/2025/09/roblox-annual-economic-impact-report
[53] https://create.roblox.com/docs/production/earn-on-roblox

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

game, incentivize long periods of gaming repeated across multiple days, and ultimately increase Roblox Corp.'s profits.

169.    Roblox Corp. knows its product incorporates addictive designs that pose risks of causing users to develop dangerous and disordered use and overuse of the product. In fact, Roblox Corp. developed addictive strategies, game designs, and monetization schemes, implemented them on the Roblox platform itself and then instructed those developing "experiences" for its platform to incorporate those addictive features into their games that would be offered to minors.

170.    Upon information and belief, Roblox Corp. designed Roblox and the addictive strategies, game designs, and monetization schemes offered in its game and game design studio in conjunction with psychologists, neuroscientists, and other behavioral experts to intentionally maximize the likelihood of addiction of minor and neurodivergent users.

171.    Roblox Corp. admits to consulting child development experts for aspects of game development.[54] Roblox Corp. actively employs or has employed psychologists and behavioral experts within its People Science and Analytics department and User Experiences department.[55]

172.    The use of operant conditioning, the use of microtransactions within an otherwise free product, a lack of warnings about the harms of use, no self-imposed limits on playtime, an achievement system that rewards prolonged and repeated gaming sessions, and other features described herein are all examples of Roblox Corp. employing harmful psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, despite Roblox Corp.'s knowledge that abuse and compulsive use of its product by foreseeable users, i.e., minors and neurodivergent individuals, can and did lead to users, including Plaintiff, suffering impacts on brain function, addiction, withdrawal symptoms, negative consequences on cognitive processes, and other injuries. Roblox Corp. marketed and misrepresented Roblox as safe

---

[54] Allowed Experience Controls, Roblox, https://en.help.roblox.com/hc/en-us/articles/8863284850196-Allowed-Experiences-Controls (last visited Sept. 29, 2025).

[55] See, e.g., Erica Snow, LINKEDIN, https://www.linkedin.com/in/erica-snow-phd-75272b39 (last visited Sept. 29, 2025); Philip Simmons, LINKEDIN, https://www.linkedin.com/in/philippsimmons (last visited Sept. 29, 2025); Carissa Kang, LINKEDIN, https://www.linkedin.com/in/carissakang (last visited Sept. 29, 2025).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

for all ages without warning of said risk of injury and addictive design, ultimately helping create and foster an epidemic of video game addiction in minors.

173. Roblox's behavior modification systems also use a compelling core loop, a robust game progression system and a gaming community to reinforce coming back to the game.

174. The Roblox core loop uses behavior techniques of "immediate fun," engaging players within the first five minutes of gameplay. Then "optimal pacing" is used to ensure the game is balanced in difficulty to the skill of the player to avoid feelings of inadequacy or difficulty creating a desire to continue playing and a false sense of achievement. Immediate feedback is provided to trigger positive reinforcement of the desired behavior of increased gameplay. To keep the continued play going an element of randomness which includes random events, new challenges or loot-drop system is deployed to lure in gamers.

## FORTNITE

**Fortnite Gameplay Basics**

175. Fortnite is an online video game and game platform designed, developed, and published by Defendant Epic Games.

176. Fortnite is free to play, making it easily accessible to all users, including minors.

177. Fortnite was first released in 2017 and is now available in three distinct game mode versions that share the same general design and engine.

178. Fortnite: Battle Royale is a free-to-play battle royale game in which up to 100 users fight in a progressively shrinking arena to be the last person standing. Users can play alone, in a duo, or in a "squad" of 3-4 players. When users land "inside the game," the user must scavenge for weapons, items, resources, and vehicles while trying to stay alive, attack, and eliminate other users. Battle Royale is frequently Fortnite's most popular game and is the game mode to which many attribute Fortnite's success.[56]

179. Fortnite: Save the World is a cooperative hybrid tower defense-shooter and survival game in which up to four users fight off zombie-like creatures and defend objects with traps and fortifications

---

[56] The Week Staff, What is Fortnite and Why is it So Popular?, The Week, https://theweek.com/93700/fortnite-battle-royale-news (Aug. 3, 2018).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

they can build. Users are awarded a number of in-game items from and during missions, including hero characters, weapon and trap schematics, and survivors, all of which can be leveled up through gained experience to improve their attributes. Save the World is the only pay-to-play game mode of the Fortnite franchise.

180. Fortnite Creative is a sandbox game mode in which users are given complete freedom to create worlds by spawning any item from Battle Royale on a personal island and can create games such as battle arenas, racecourses, platforming challenges, and more.

181. Each of Epic Games' Fortnite products has similar graphics, art assets, and game mechanics.

182. Fortnite has an average of 239 million monthly players and a peak of 15 million players in a day.[57]

183. Less than two years after Fortnite's release, the games had generated over $9 billion in revenue through microtransactions and in-game purchases. In 2021 alone, Fortnite generated $5.8 billion in revenue.[58]

184. Fortnite game Products are monetized using V-Bucks: in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.[59]

185. Fortnite includes a feature called a "Battle Pass," which is the same feature as a "season pass" as described above. The Battle Pass in Fortnite allows players to earn various rewards by "levelling up" the Pass. Levelling up can be done by earning medals during gameplay, completing challenges, and purchasing the levels with V-Bucks.[60] V-Bucks are in-game currency that can be purchased with real-world funds or earned through completing missions and other achievements in Save the World.

[57] This statistic is as of July 2023. *Fortnite Player Count: How Many People Play the Game?* The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite-player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.
[58] This statistic is as of July 2023. Fortnite Player Count: How Many People Play the Game? The Econ. Times (Jul. 14, 2023), https://economictimes.indiatimes.com/news/international/us/fortnite- player-count-how-many-people-play-the-game/articleshow/101767141.cms?from=mdr.
[59] Sunil Gill, Fortnite Revenue, Player Count & Net Worth 2024, Priori Data (Apr. 1, 2024), https://prioridata.com/data/fortnite-statistics/.
[60] What is the Battle Pass? Where Can I Learn More?, Fortnite Support, https://www.epicgames.com/help/en-US/c-Category_Fortnite/c-Fortnite_Gameplay/what-is-the- battle-pass-where-can-i-learn-more-a000084706 (last visited Sept. 3, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

186. V-Bucks in Save the World can be used to buy loot boxes, in the form of llama-shaped pinatas, to gain a "random" assortment of items.

187. V-Bucks in Battle Royale can be used to buy cosmetic items like character models or the game's battle pass: a tiered progression of customization rewards for gaining experience and completing certain objectives during the course of a Battle Royale season.

188. These features are only available if a user purchases a Battle Pass. The purpose of the Battle Pass is to keep players engaged in hours of gameplay trying to earn rewards, and to increase profits for Epic Games through the purchase of in-game content.

**Fortnite's Youth-Focused Partnerships Contradict Game Rating but Increase Profits**

189. Fortnite's Battle Royale and Save the World are rated T for Teen, i.e., recommended for individuals aged 13 and above. This does not mean younger children cannot use them or that Epic Games does not know that children under 13 are using Fortnite Products. Rather, Epic Games is aware and markets Fortnite to consumers of all ages, and particularly to minors.

190. Despite its T rating, survey results from 2019 show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17.[61]

191. Even though most Fortnite games are rated T, Fortnite (specifically Battle Royale) has engaged in numerous collaborations with child-friendly entities such as Disney, LEGO, Marvel, NERF, Air Jordan, DC Comics, PAC-MAN, the NFL, Ninja, Rocket League, Ghostbusters, Star Wars, TRON, Neymar Jr., the NBA, LeBron James, Ariana Grande, Naruto, Indiana Jones, Dragon Ball, Spiderman, Batman, TikTok, The Nightmare Before Christmas, Wreck-It Ralph, Lewis Hamilton, Teenage Mutant Ninja Turtles, Nike, Pirates of the Caribbean, and more.[62]

192. Most, if not all, of these collaborations are geared towards a wide audience that unmistakably includes minors under the age of 13. Many young children watch Disney movies, play with LEGOs, or listen to the music of pop stars like Ariana Grande. Epic Games is explicitly and intentionally marketing its Fortnite games to young children by collaborating with the above entities.

---

[61] National Research Group, Fortnite: The New Social Media? (June 4, 2019), available at https://assets.ctfassets.net/0o6s67aqvwnu/5z4ja8fNx2NputEG49AVWs/ff1f591ad988f9a30856bab6 8e3908bb/NRG_Fortnite_White_Paper.pdf.
[62] Josh Taylor, Every Single Fortnite Collab & Crossover in Battle Royale's History, Dexerto (Aug. 26, 2024), https://www.dexerto.com/fortnite/every-fortnite-collab-crossover-battle-royale-history- 1645672/.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

193.    Not only does Epic Games engage in in-game collaborations, but they also have physical merchandise they produce or sponsor, most of which are toys or children's items. For example, Fortnite creates plastic toy loot boxes and battle boxes, action figures, NERF guns, trading cards, board games, motorized toy cars, LEGO sets, and Halloween costumes. Fortnite has partnered with children's toymakers like Hasbro to create some of these items.

194.    Epic Games knows that young children play Fortnite.

195.    Epic Games organizes its advertisement and collaboration strategies around the interests of young children. And in 2024, Epic Games's projected annual revenue is $5.8 billion.[63] As a result of, in part, its partnership strategies, Epic Games will make a significant portion of that $5.8 billion from young children and their families, while its partnerships further encourage children under 13 to keep using its products.

**Fortnite was Designed with Intentionally Addictive Features**

196.    Epic Games designed Fortnite with numerous psychological tactics to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

197.    Epic Games actively employs or has employed psychologists and behavioral experts within its User Experiences department and Online department.[64]

198.    Upon information and belief, Epic Games designed Fortnite in conjunction with psychologists and other behavioral experts to ensure the addiction of minor and neurodivergent users.

[63] Josh Howarth, Fortnite User and Growth Stats 2024, Exploding Topics (Jul. 22, 2024), https://explodingtopics.com/blog/fortnite-stats.
[64] See, e.g., Ben Taels, LINKEDIN, https://www.linkedin.com/in/ben-taels-06913a15 (last visited Sept. 4, 2024); Celia Hodent, LINKEDIN, https://www.linkedin.com/in/celiahodent (last visited Sept. 4, 2024); Video Games, Psychology, and the User Experience with Dr. Celia Hodent (Epic Games), NC State University Libraries, https://www.lib.ncsu.edu/events/video-games-psychology- and-user-experience-dr-celia-hodent-epic-games#:~:text=Video%20Games%2C%20Psychology%2C%20and%20the,Games)%20%7C%20N C%20State%20University%20Libraries (Feb. 2, 2016); Katelyn Procci, LINKEDIN, https://www.linkedin.com/in/katelynprocci (last visited Sept. 4, 2024).

-34-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

199. The use of microtransactions within an otherwise free product, a lack of warnings about the harms of use, no self-imposed limits on playtime, and other features described herein are all examples of Epic Games employing these psychological tactics.

200. Epic Games failed to disclose that it designed the Fortnite products with numerous psychological tactics, such as operant conditioning, to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) and to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, i.e., minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm.

201. One tactic used by Epic Games is a psychological trick of "lose by a little, win by a lot" or "near miss" effect. Essentially, when a player loses a round, they lose by only a slight margin, compelling them to play another round because they were just a few moves away from winning. When players lose, they rationalize their defeat and often tell themselves that what topped them from winning was the smallest mistake. As a result, players want to play another match over and over again.

202. The "near miss" effect means that when users perceive that they lost by only a slight margin, they do not actually have to win a match to feel the high of a win. Such strategy lies in getting users close to the feeling of winning, because when they are that close, they feel the same buzz and go on to play more rounds. On the other hand, when they do win a round, they win a lot of perks, giving them a spurt of dopamine and the adrenaline rush to play again.

203. In the hopes of increasing their rank in the game through wins, players continue to play without any pause or rest.

204. Fortnite also uses random reward tactics—known in psychology as the "variable interval schedule" or "variable ratio schedule"—the idea that randomized small wins will continue to draw in users. **This is the same mechanism used by casinos to keep their patrons gambling**.[65]

205. With each small win, the brain is rewarded with a small spurt of dopamine—no matter how random small rewards may be.

---

[65] Weinschenck, S., "Use Unpredictable Rewards to Keep Behavior Going," *Psychology Today* (Nov. 13, 2013), https://www.psychologytoday.com/us/blog/brain-wise/201311/use-unpredictable-rewards-to-keep-behavior-going

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

206. Additionally, the design of Fortnite keeps players drawn in. The bright and vibrant colors and cartoonish representation of the game make it more appealing than other bleak multiplayer battle royale games.

207. Similarly, the mechanics of the game inject elements of variety, allowing players to find ideal hiding spots, loot drops, explore the entire map, build towers and forts using resources, and more. In designing such mechanics, Epic Games ensures that players never once get bored while playing.

208. To keep players even more engaged, Epic Games often rolls out updates that keep players busy with engaging and fresh features, new maps, live events, and the latest trends. Such updates can also remove minor glitches that may be bothering the players as well. Fortnite also keeps players coming back daily by giving "Daily Quest" assignments that players can complete to earn V-bucks:[66]



209. Players will thus continually log into the game to complete these quests and earn V-bucks for in-game spending.

210. These features, combined with the ease of accessibility—the game is free to play on multiple platforms and devices—fosters addiction in minors and young adults because it draws players in and allows them to play nearly anywhere at any time.

211. Epic Games knew that its Fortnite Products contained an inherent risk of abuse, addiction, and compulsive use by minors and the harms that arise therefrom, but instead of disclosing such harms,

---

[66] https://fortnite.fandom.com/wiki/Quests_(Battle_Royale).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Epic Games marketed Fortnite as "educational" and safe for use by minors (inside and outside the classroom).

212.    Epic Games misrepresented Fortnite as educational and safe for use by minors and neurodivergent individuals, including Plaintiff, while knowing that abuse, addiction, and compulsive use by such product users can lead to brain damage and injury, and knowing that it had designed and developed Fortnite to be as addictive as possible.

213.    Epic Games did not inform and concealed from the public, including Plaintiff, that Fortnite products pose significant risks of harm to users due to Epic Games' decision to design Fortnite to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent individuals can lead to brain damage and injury in those individuals.

**Fortnite Deceptively Promises Safety and Educational Value**

214.    Epic Games assures users that it wants its Fortnite product to be a "safe place for [users] to play games."[67]

215.    Despite assurances of safety, the addictive properties and design features, as alleged herein, of the Fortnite game products are so dangerous to users, and especially minors, that several health and behavioral centers across the country have published resources for parents specifically warning about Fortnite addiction.[68] Many health experts have concluded that Fortnite is more addictive than heroin and other illegal drugs.[69]

216.    Despite these third-party warnings of the dangers of Fortnite, Epic Games has failed to disclose the risks of harm purposefully built into the Fortnite game products.

217.    Although Fortnite features some parental controls in its product, they are grossly deficient. While minor accounts are automatically created with some restrictions on communication and other features, there is no age verification process. If a minor who is under 13 wants to sign up with a

---

[67] Epic Games: Community Rules, Epic Games, https://www.epicgames.com/site/en- US/community-rules (last visited Nov. 26, 2024).

[68] Rachel Ehmke, A Parent's Guide to Dealing With Fortnite, Child Mind Institute, https://childmind.org/article/parents-guide-dealing-fortnite/ (last visited Aug. 26, 2024).

[69] Health Experts: Video Game "Fortnite" Can Be Addictive As Heroin, KRON ABC 8 News (Sep. 29, 2018), https://www.wric.com/news/whats-trending/health-experts-video-game-fortnite-can-be- addictive-as-heroin/.

-37-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

fictitious birth date, they can, and can play Fortnite without the restrictions of an account where the user represents they are under 13.

218.    Fortnite could, but chooses not to, require express parental consent for minors under 13 to create an account. If a minor under 13 creates an account, they can still access most game content and purchase items.

219.    Fortnite is also available for free on multiple other platforms, including Epic Games, Steam, and PlayStation.

220.    Fortnite imposes a daily spending limit on minors under 13, however, that limit is $100 per day.[70] A minor under 13 could spend $36,500 on Fortnite in a year without any parental consent or permission.

221.    Guardians can access parental controls to change the automatic restrictions set by Fortnite if their minor is under 13, however, Fortnite only allows a parent to adjust parental controls for any minor account through their minor's account. To engage with/change any parental control settings, the parent must first know that the account exists and subsequently know the log in information for their minor's account.

222.    Fortnite does not provide parental controls regarding screen time, gameplay, and/or usage. Fortnite could, but chooses not to, allow parents to set time limits on their minor's Fortnite account. Fortnite also could, but does not, allow any users to set self-imposed time limits on their Fortnite account.

223.    At account setup, Fortnite's website contains no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

224.    During gameplay, there are no warnings labels, banners, or messaging informing minor users of the known risks and harms stemming from the use of Epic Games' product. Users are not provided with information regarding potential physical and mental harm associated with gameplay.

---

[70] Daily Spending Limits For Players Under 13, Epic Games, https://www.epicgames.com/help/en- US/c-Category_EpicAccount/c-EpicAccounts_ParentalControls/daily-spending-limits-for-players- under-13-a000085524 (last visited Aug. 26, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

225. Epic Games designed and developed Fortnite games with the use of addictive operant conditioning to make users want to keep using the products more and more.

226. The team that developed Fortnite includes psychologists, statisticians, analysts, and coordinators who worked for nearly four years to develop products that were addictive as possible.

227. Upon information and belief, Epic Games has licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in Fortnite products.

228. Epic Games does not disclose to the public or the users of Fortnite any of the psychological tactics or addictive features it purposefully incorporates into its products. Instead, Epic Games touts its Fortnite game products as "educational" and markets them for use in the classroom.

229. On its website, Epic Games even offers "Free Fortnite lesson plans" to educators on subjects ranging from history, geography, and programming:[71]



230. Epic Games joined the Family Online Safety Institute ("FOSI") in 2023, stating they want to "support [FOSI's] work to keep kids safe online." Epic Games' Senior Director of Public Policy represents Epic Games wants to "be on the forefront of creating fun and safe games and experiences for

---

[71] Education, Epic Games, https://dev.epicgames.com/documentation/en-us/fortnite- creative/education-in-fortnite-creative (last visited Aug. 26, 2024).

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

people of all ages," emphasizing its alleged focus on the importance of safety for children playing its games, including Fortnite.[72]

231. Engaging and addicting users who are minors early and in environments such as their classroom increases Epic Games's revenue through continued use of its Fortnite Products by young users, at the expense of these users' mental and physical health.

232. Epic Games does not adequately inform, or inform at all, users of the inherent risks involved with using Fortnite game Products, specifically including that Fortnite was designed to addict users to their extreme harm and detriment.

**K.    PLAINTIFF-SPECIFIC ALLEGATIONS**

233. At the age of nine, Plaintiff was diagnosed with autism.

234. Also at the age of nine, Plaintiff began playing video games, including Fortnite and Roblox.

235. Soon Plaintiff's usage of each Defendant's products was compulsive and disordered, and his parents had no ability to monitor his game play time nor were they aware that his behavior was being modified to continue playing games to his detriment.

236. The operant conditioning tricks employed by each Defendant were successful in creating a video game addiction which was a substantial factor in Plaintiff's video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

237. Currently, Plaintiff is a twenty-three (23) year old who now has no interest in any activities besides playing video games. Plaintiff becomes irritable when he does not have access to the Products. When Plaintiff is not playing video games, he is thinking about playing the games constantly. Plaintiff has lost friendships and has used money that was not his to purchase video games. Plaintiff has

---

[72] Epic Games Joins the Family Online Safety Institute, FOSI (Nov. 28, 2023), https://www.fosi.org/about-press/epic-games-joins-the-family-online-safety-institute.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

no ability to control nor decrease his usage of video games despite numerous attempts to do so. Plaintiff has suffered depression, anxiety, anger, rage, poor academic performance, social isolation, withdrawal, an inability to stop gaming, and other damages as a result of his gaming addiction.

238.    Plaintiff was injured and harmed as a direct and proximate result of each Defendant's actions and misconduct, and for that he is entitled to compensation and other damages under California law.

239.    As a minor child, Plaintiff never agreed to be harmed or exposed to an addictive product. Plaintiff never entered into a contract with any of the Defendants, and/or to the extent that any Defendant claims Plaintiff attempted to accept an electronic terms and conditions clause by clicking buttons on a screen which included language Plaintiff did not understand, read, or language which was conscionable, and has been made void by virtue of its unconscionability and the power of disaffirmance. This unconscionability and disaffirmance is demonstrated and secured by the filing of this Complaint.

240.    Specifically, to the extent that any Defendant claims Plaintiff entered into a contract, any terms to which Plaintiff agreed as a child are void and unenforceable. Each Defendant's terms of services or terms and conditions clauses is a contract of adhesion and has no variation or negotiable terms prior to the signing of parties. Further, Plaintiff, as a minor, lacked the capacity to contract, and thus expressly disaffirms any contract he may have made with any of the Defendants when he was a minor, or that Defendants may claim they made with Plaintiff before he reached the age of majority, including but not limited to any arbitration agreements.

241.    Plaintiff's continued use of Defendants' products, to the extent such use exists, is compulsive and due to Plaintiff's addiction to using the products. Plaintiff's continued use does not serve as an affirmation of any potential contract between the parties.

242.    Plaintiff's addiction and damages were established during the years he played these games as a minor before he reached the age of majority. Therefore, he specifically disaffirms any contract or arbitration provision as it relates to the addiction and injuries he suffered as a child, such injuries and damages continuing to this day.

-41-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

243. Each Defendant has engaged in deceptive, unfair, immoral, and reckless behavior that led to the injuries sustained by Plaintiff. For this, they should be punished, and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## V. PLAINTIFF'S CLAIMS

### COUNT I – STRICT PRODUCT LIABILITY – DESIGN DEFECT

### (Against All Defendants)

244. Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

245. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which assured video game addiction would occur in minors, as well as the lack of necessary safeguards.

246. The video game products that each Defendant placed into the stream of commerce were defectively designed. The products were designed to cause addictive and compulsive use, including by minors. The products are not reasonably fit, suitable, or safe for their intended purpose of playing a game without suffering from psychological harm as a result of subversive behavioral modification.

247. The defective conditions of Roblox and Fortnite rendered it unreasonably dangerous and/or not reasonably safe. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

248. The defects in each Defendant's respective designs were present in the products when the products left the hands of Defendants and when they were released to the general public to be used in an intended and foreseeable manner with concealment of the operant conditioning.

-42-

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

249. Roblox and Fortnite, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each product's design including addictive operant conditioning techniques designed to create addiction, each product's design lacking warnings about the risk of addiction, each product's design lacking safeguards such as user-imposed time restrictions on gameplay, each product's design lacking proper minor age verification, and each product failing to operate as a reasonable user would expect.

250. Neither Plaintiff nor his parents were ever made aware of the fact that operant conditioning was used in Roblox and Fortnite and did not agree to having such behavior modifications used on Plaintiff. As to any "Use" agreement of playing a video game that any Defendant claims exists with Plaintiff, Plaintiff rejects this argument based upon lack of informed consent to allow operant conditioning to be used on Plaintiff. Plaintiff never consented to be subject to the same subversive behavioral modification techniques used by casinos to increase gameplay and spending.

251. Each Defendant designed its products to be addictive and take advantage of the concealed use of operant conditioning and the chemical reward system of users' brains to establish compulsive use and addiction.

252. Each Defendant's respective products were expected to and did reach Plaintiff without substantial change in the condition in which they were designed, manufactured, labeled, marketed, promoted, supplied, and otherwise released into the stream of commerce.

253. Plaintiff used Defendants' respective products, Roblox and Fortnite, in an intended and reasonably foreseeable manner, and the products were not materially altered prior to their use. Defendants' products reached Plaintiff without substantial change to them.

254. Each Defendant knew or, by the exercise of reasonable care, should have known that minors, including Plaintiff, would use their products without anyone inspecting the products for addictive or other dangerous features.

255. Each Defendant's respective products were defective and were a substantial factor in causing Plaintiff's injuries and harm.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

256. Reasonable users of Defendants' products would not expect, and Plaintiff herein did not expect, that said products would pose risks of severe video game addiction and the corresponding sequalae of mood disorders, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance.

257. Reasonable users of Defendants' products would not expect that Defendants would conceal the operant conditioning, risks of video game addiction, and sequalae of that addiction, but Defendants nevertheless chose to place their products into the stream of commerce while knowing of both the concealment and risk of harm.

258. Each Defendant could have completely avoided the harm by not utilizing operant conditioning in game design, provided proper game time tracking and a design to limit game play while still providing an optimal gaming experience.

259. At the time each Defendant's products were designed, developed, distributed to Plaintiff and played by him, safer alternative designs existed that were entirely technologically feasible to implement.

260. Each Defendant could have utilized cost effective, reasonably feasible alternative designs to minimize harm caused by their respective products by implementing elements that include, but are not limited to:

    a.   warnings of the use of operant conditioning behavior modification systems;

    b.   fully informed consent to operant conditioning behavior modification systems;

    c.   robust age verification mechanisms;

    d.   effective parental controls;

    e.   removal of barriers to the enactment of parental controls;

    f.   warnings as to the health effects of use and extended use upon sign-up;

    g.   opt-in restrictions to the length and frequency of sessions;

    h.   self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    i.   tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

-44-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

j.   self-imposed limits for microtransactions; and

k.   others as set forth herein.

261.   Instead, each Defendant designed their respective products to aggressively addict users with operant conditioning aimed to increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

262.   Each Defendant's respective defective product, and Plaintiff's use of each Defendant's product, was the direct and proximate cause of Plaintiff's injuries and harm that include, but are not limited to, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance.

263.   Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the products' design, marketing, distribution, and operation.

264.   As a direct and proximate result of each Defendant's defective products, Plaintiff suffered psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, significant decline in academic performance, which resulted in academic dismissal, and economic loss.

265.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

### COUNT II – STRICT PRODUCT LIABILITY – FAILURE TO WARN

### (Against All Defendants)

266.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

267.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video

game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning built in games to ensure continuous video game play leading to video game addiction and the sequalae of that addiction.

268.    Defendants knew that their respective products concealed the built-in operant conditioning rendering the games unreasonably dangerous, harmful, capable of causing and in fact were designed to cause compulsive, addictive use, particularly in minors, and that such use could result in severe physical, mental, and emotional injuries.

269.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks of their products nor be capable of knowing that operant conditioning was being used on players in the games.

270.    Defendants knew, or should have known, that the use of Roblox and Fortnite was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

271.    Each Defendant owed a duty to warn consumers of the foreseeable risks and dangers of their respective products that Defendants knew were present, but not obvious or known to users, especially underage users, or their caregivers, or any average member of the consuming public.

272.    At the time Defendants' products left Defendants' control, they did not include – nor have they ever included – warnings that the products pose an unreasonable risk of harm to users, particularly minors. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacks any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

273.    Each Defendant failed to provide timely and adequate warnings, instructions, and information by, including but not limited to:

      a.   failing to warn Plaintiff of the use of operant conditioning behavior modification systems;

      b.   failing to obtain from Plaintiff informed consent to operant conditioning in the games;

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

c.  failing to warn Plaintiff, his parents and his schools that operant conditioning was used in the games;

d.  failing to ensure the products included warnings regarding their addictive design that were accurate, conspicuous, and adequate, despite having extensive knowledge of the risks associated with their use;

e.  failing to conduct adequate pre-and-post-market safety testing such that an adequate warning could have been issued to Plaintiff;

f.  failing to include adequate and conspicuous warnings that would alert Plaintiff or his parents to the dangerous risks of the products, including but not limited to the risks of causing severe and life-altering physical, mental, and emotional disorders and behaviors in minors, especially those with neurodivergent qualities;

g.  failing to issue warnings to consumers like Plaintiff regarding the dangerous risks of the products even after the sale and/or download of their products; and

h.  representing that the products were and are safe for use, when in fact, Defendants knew or should have known that their products were designed to cause minors like Plaintiff to engage in excessive use until they developed an addiction or disordered compulsion to use the products.

274.  Moreover, each Defendant's non-feasance, failure to act, and omissions in the development, set up, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their respective products rendered the product unreasonably dangerous. Those failures include but are not limited to:

a.  incorporating operant conditioning into the infrastructure of game play to reward continuous video game play;

b.  designing the products to be more addictive and to target specific individuals based on information obtained and retained by Defendants and/or third parties;

c.  failing to implement effective parental controls;

d.  failing to implement reasonably available means for users or their parents to monitor for and limit or deter their own excessive frequency or duration of use of products,

-47-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

    e.   failing to implement reasonably available means to monitor for and limit or deter excessive overspending by minors on in-game downloadable products and upgrades and in-game purchases and/or microtransactions; and

    f.   failing to implement reasonably available means to allow users or their parents to limit or deter use of products by minors during ordinary times for school or sleep.

275.    Each Defendant's failure to adequately warn about its defective product created a danger of injuries described herein that were reasonably foreseeable at the time of the design, development, and dissemination of the product.

276.    A reasonable company under the same or similar circumstances would have warned and instructed Plaintiff or his parents of the dangers of its product.

277.    Had Plaintiff or his parents been aware that the products could cause significant harm including an increased risk of suicide, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff or Plaintiff's parents, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

278.    The addictive nature of each Defendant's defective product and failure to warn about said product actually and proximately caused Plaintiff's video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

279.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT III – NEGLIGENCE – DESIGN**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**(Against All Defendants)**

280. Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

281. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous.

282. Defendants knew, or should have known, that the use of Roblox and Fortnite was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

283. Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Roblox and Fortnite.

284. Each Defendant owed a duty to all reasonably foreseeable users to design a safe product.

285. Roblox and Fortnite, as designed, were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of the reasons enumerated in this Complaint, including, but not limited to, each product's design including addictive operant conditioning, each product's design lacking warnings about the risk of addiction, each product's design lacking safeguards such as user-imposed time restrictions on gameplay, each product's design lacking proper minor age verification, and each product failing to operate as a reasonable user would expect.

286. Defendants breached their duty by failing to use reasonable care in the design of their products by negligently designing Roblox and Fortnite to specifically appeal to and to take advantage of minors, who were particularly unable to appreciate the risks of the products.

287. Defendants breached their duty by failing to use cost effective, reasonably feasible alternative designs that would make their products less addictive and harmful to minors, including but not limited to:

    a. warnings of the use of operant conditioning behavior modification systems;

    b. fully informed consent to operant conditioning behavior modification systems;

    c. robust age verification mechanisms;

    d. effective parental controls;

-49-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

e.   removal of barriers to the enactment of parental controls;

f.   warnings as to the health effects of use and extended use upon sign-up;

g.   opt-in restrictions to the length and frequency of sessions;

h.   self-limiting tools, including but not limited to session time notifications, warnings, or reports.

i.   tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

j.   self-imposed limits for microtransactions; and

k.   others as set forth herein.

288.   Instead, each Defendant designed their respective products to aggressively addict users with features that increase use time, frequency of use, and profit to each Defendant, all to the detriment of users' wellbeing.

289.   A reasonable company under the same or similar circumstances would have designed a safer product.

290.   Plaintiff was harmed directly and proximately by each Defendant's failure to use reasonable care in the design of its product.

291.   As a direct and proximate result of each Defendant's negligence, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

292.   Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT IV -NEGLIGENT FAILURE TO WARN**

**(Against All Defendants)**

293.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

294.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and/or benefited from the products and platforms that Plaintiff used.

295.    Defendants knew, or should have known, that the use of their products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

296.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable considering each Defendants' own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Plaintiff.

297.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Roblox and Fortnite are highly addictive and likely to cause physical, mental, and emotional injuries as listed above.

298.    None of Defendants' products, as identified herein, contain a warning, nor have they ever contained a warning, that their products contained operant conditioning to elicit continuous video game play which poses an unreasonable risk of harm and addiction to users, particularly minors. Defendants' products did not contain a warning when the products left their possession.

299.    Had Plaintiff and/or Plaintiff's parents received adequate warning about the risks of Defendants' products, Plaintiff and/or Plaintiff's parents would have heeded such warnings.

300.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably foresee.

301.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective products cause addiction, compulsive use, and/or other physical, mental, emotional, and developmental delay injuries, including an increased risk of suicidality.

302.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

303.    As a direct and proximate result of Defendants' breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

304.    As a direct and proximate result of each Defendant's material misrepresentation and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

305.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT V – INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

306.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

307.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to operant conditioning which ensured continuous video game play and increased the risk of video game addiction.

308.    Defendants knew, or should have known, that the use of their respective products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

309.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable considering each Defendant's own internal information and knowledge regarding its product at the time of the product's development, design, marketing, promotion, advertising, and distribution to Plaintiff. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

310.    Defendants knew, or should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products.

311.    At the time each Defendant's product left their respective control, the products did not include – nor has they ever included – warnings that the products pose an unreasonable risk of harm to users, particularly minors.

312.    Had Plaintiff or Plaintiff's parents been aware that the products could cause significant harm, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use each Defendant's product. Alternatively, if Defendants had adequately warned or instructed Plaintiff and/or Plaintiff's parents, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

313.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product in a manner which the manufacturer should reasonably foresee.

314.    Defendants breached their duties owed to foreseeable users. That breach includes a failure to warn users that Defendants' respective products cause addiction, compulsive use, and/or other physical and mental injuries.

315.    A reasonable company under the same or similar circumstances would have used reasonable care to provide adequate warnings to consumers, and parents of minor consumers.

316.    As a direct and proximate result of each Defendant's breach of duty to provide adequate warnings, Plaintiff was harmed and sustained the injuries set forth herein.

317.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to

interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

318.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VI – NEGLIGENCE – ORDINARY

### (Against All Defendants)

319.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

320.    Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, including Plaintiff.

321.    Defendants, in their role as product designers, developers, manufacturers, marketers, and sellers, and otherwise engaging in activity culminating in placing their products into the stream of commerce, owed a duty to exercise ordinary care in designing and placing the products into the stream of commerce. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

322.    Defendants also owed a duty to warn users of the hazards of using their products, which Defendants knew were present in their products, though such hazards were not obvious to users and particularly not so to minor users.

323.    Defendants' duties also include a duty to exercise ordinary care and act as a reasonably careful company would under the circumstances.

324.    Each Defendant created harmful and addictive products and failed to engage in the development of safer alternative designs.

-54-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

325.    For their own profit, each Defendant affirmatively chose not to engage in the development of a safer alternative designs.

326.    Each Defendant was negligent, reckless, and/or careless in failing to exercise ordinary care.

327.    Defendants' failure to act in developing a safer alternative designs constitutes a breach of their duty of reasonable care.

328.    Defendants knew, or should have known, that their products are harmful, capable of causing extensive physical, mental, emotional, and financial or economic harm and damage, and that minor users are developing disordered and addicted use.

329.    Defendants were and are negligent in failing to provide adequate warnings about the dangers associated with using their products and in failing to warn users, and the parents of users who are minors, including Plaintiff, about how and when, if ever, to safely use their products.

330.    Defendants were and are negligent in failing to provide users, and their caregivers in the case of users who are minors, including Plaintiff, the tools to ensure that their products are used in a limited and safe manner.

331.    As a result of each Defendant's breach of the herein identified duties and resulting negligence, Plaintiff suffered from injuries and damages from his video game addiction, including physical, psychological, and economic harm.

332.    Each Defendant's breach of duty of care to Plaintiff was a substantial factor in causing harm to Plaintiff and is the actual and proximate cause of said harm.

333.    As a direct and proximate result of each Defendant's negligence, Plaintiff suffered significant video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

334.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard

for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT VII – INTENTIONAL MISREPRESENTATION

### (Against All Defendants)

335.    Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

336.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Roblox and Fortnite and the lack of warnings about the risk of addiction.

337.    As detailed herein, Defendants knew about the defective conditions of their respective products and that the products posed serious health risks to users, particularly minors.

338.    Each Defendant designed their respective products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff.

339.    Each Defendant knew of the risks associated with the use of their respective products based on internal research and external studies known within the industry.

340.    Each Defendant could have disclosed the defective condition of their respective products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices. The inclusion of operant conditioning to increase continuous game play was concealed from parents, players, and schools. The resulting probability and seriousness of harm was unethical and lacked any disclosure of the risks. The burden of informing the public at large that operant conditioning was being utilized, thereby facilitating informed decisions about use of the product

and consent to allowing operant conditioning behavior modification systems, is not a high burden and, furthermore, is mandated for the licensed psychologists who were employed by Defendants.

341. Each Defendant knowingly and intentionally misrepresented that their respective products were safe for use, and safe as educational tools, to further entice users to continue engaging with their respective products, including Plaintiff, while simultaneously knowing that their respective products each caused addiction and compulsive use.

342. Defendants' statements about the safety of their respective products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective products is misleading and deceitful.

343. Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective products were safe for use to keep users engaging with their products and increase their profits, and purposefully marketed their products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their products and to increase their profits.

344. However, each Defendant had no reasonable grounds to believe that their respective products were safe given the internal and external research on addiction associated with video game use and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective products.

345. Each Defendant failed to disclose to users, including Plaintiff, that their products are designed to create and sustain addiction.

346. Each Defendant intentionally failed to disclose to users the strategies and features designed and employed in their Products to create and sustain addiction.

347. Each Defendant intentionally failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

348. If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could cause significant harm such as increased risk of suicide, brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

and behavioral addiction disorders, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

349.    Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendants' products. Plaintiff reasonably relied on each Defendant's representations that its respective product was safe for use, particularly for minors.

350.    Plaintiff and Plaintiff's parents reasonably relied on each Defendant's representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' products.

351.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

352.    Because of Plaintiff's and Plaintiff's parents' reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as economic damages.

353.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

354.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

**COUNT VIII – NEGLIGENT MISREPRESENTATION**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

**(Against All Defendants)**

355.   Plaintiff realleges and incorporates by reference all the foregoing allegations of every paragraph of this Complaint as if repeated in full here.

356.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff, each of which are defective and unreasonably dangerous due to the concealment of operant conditioning being used in Roblox and Fortnite with the behavior goal of continuous video game play and increased risk of video game addiction.

357.   As detailed herein, Defendants knew about the defective conditions of their respective products and that the products posed serious health risks to users, particularly minors.

358.   Each Defendant designed their respective products with addictive psychological features to keep users playing more often and for longer periods of time, while knowing that abuse and compulsive use by youth can lead to injury, but concealed this information from the public and product users, including Plaintiff.

359.   Defendants knew of the risks associated with the use of their products based on internal research and external studies known within the industry.

360.   Each Defendant could have disclosed the defective condition of their respective Products to the public and could have advised that the Products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures of marketing practices.

361.   Defendants knowingly and intentionally misrepresented that their products were safe for use, and safe as an educational tool, to further entice users to continue engaging with their products, including Plaintiff, while simultaneously knowing that their respective products each caused addiction and compulsive use.

362.   Each Defendant's statements about the safety of their respective products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective products is misleading and deceitful.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

363.    Each Defendant intended for users, including Plaintiff, to rely on their representations that their respective products were safe for use to keep users engaging with their products and increase their profits, and purposefully marketed their products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their products and to increase their profits.

364.    However, each Defendant had no reasonable grounds to believe that their respective products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant made false statements about the safety of their respective products.

365.    Defendants failed to disclose to users, including Plaintiff, that their products are designed to create and sustain addiction.

366.    Defendants failed to disclose to users the strategies and features designed and employed in their products to create and sustain addiction.

367.    Defendants failed to disclose their addictive strategies and features to entice users to continue gameplay and increase profits.

368.    If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could cause significant harm such as brain damage, psychological injury, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, increased suicide risk and behavioral addiction disorders, Plaintiff's parents would not have allowed Plaintiff to use or continue to use each Defendant's respective product. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff's parents and/or Plaintiff, they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

369.    Plaintiff and Plaintiff's parents were unaware of the dangerous and addictive nature of Defendant's products. Plaintiff and Plaintiff's parents reasonably relied on Defendant's representations that its products were safe for use, particularly for minors.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

370.   Plaintiff and Plaintiff's parents reasonably relied on Defendants' representations and did not know, nor had any way of knowing, about the misrepresentations about Defendants' products.

371.   A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

372.   Because of Plaintiff's and Plaintiff's parents' reasonable reliance on each Defendant's representations, Plaintiff sustained physical and psychological harm, as well as damages.

373.   Defendants' misrepresentations were a substantial factor in causing harm to Plaintiff, who suffered significant injury, harm, damages, and economic loss, and will continue to suffer such harm, damages, and economic loss in the future. Thus, Plaintiff seeks actual damages according to proof.

### COUNT IX – FRAUD

### (Against All Defendants)

448.   Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

449.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, supplying, leasing, selling, and/or otherwise distributing their respective video game products used by Plaintiff each of which are defective and unreasonably dangerous due to concealment of operant conditioning being used in Roblox and Fortnite to increase the chances of continuous video game play and thereby also increased the chance of video game addiction.

450.   As detailed herein, each Defendant knew about the defective conditions of its products and that the products posed serious health risks to users, particularly minors, young adults, and neurodivergent individuals.

451.   Each Defendant knew their products posed risks to minors, like Plaintiff, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant

misrepresented the safety and value of their games for the purpose of inducing users, like Plaintiff, to purchase/download the game and to continue using Defendants' products and encourage the addiction knowingly caused by Defendants' products.

452.     Each Defendant's statements about the safety of their respective products are false and misleading, and each Defendant's omission of the potential harm caused by Defendants' respective products is misleading and deceitful.

453.     Each Defendant could have disclosed the defective condition of their products to the public and could have advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

454.     Defendants knowingly and intentionally misrepresented that their products were safe for use to further entice users to continue engaging with their products, including Plaintiff.

455.     Each Defendant intended for users, including Plaintiff and Plaintiff's parents, to rely on their representations that their respective products were safe for use to keep users engaging with their products and increase their profits, and purposefully marketed their products to minors for that reason. Each Defendant's representations about safety were material in keeping users engaged with their products and to increase their profits.

456.     If each Defendant had not concealed, omitted, and misrepresented facts regarding the safety of their products, and had Plaintiff and/or Plaintiff's parents been aware that the products could cause continuous video game play resulting in significant harm such as video game addiction and the attendant sequalae of lack of prefrontal cortex development in the brain, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal, Plaintiff's parents would not have purchased or allowed Plaintiff to use or continue to use each Defendant's respective products. Likewise, Plaintiff would not have used or continued to use Defendants' products. Alternatively, if Defendants had adequately warned or instructed Plaintiff and /or Plaintiff's parents,

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

they would have taken precautions when using each Defendant's respective product in order to eliminate or mitigate the risk of harm.

457.    However, each Defendant had no reasonable grounds to believe that their respective products were safe given the internal and external research on addiction and given the global recognition of video game addiction. Each Defendant knowingly made false statements about the safety of their respective products.

458.    As a direct and proximate result of each Defendant's material omissions, Plaintiff and Plaintiff's parents had no reason to believe that each of Defendant's products were unsafe for children to use.

459.    Plaintiff and Plaintiff's parents reasonably relied on each Defendant's misrepresentations that each of their products was safe for use.

460.    A reasonable person, including Plaintiff and Plaintiff's parents, would find information that impacted the users' health, safety, and well-being – such as the serious adverse health risks associated with the use of Defendants' products – to be important when deciding whether to purchase, download, use, or to continue to use, those products. Thus, Plaintiff and Plaintiff's parents justifiably relied on each Defendant's misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content.

461.    As a direct and proximate result of each Defendant's material misrepresentations and false statements, Plaintiff suffered video game addiction, psychological injury, emotional distress, diminished social interactions, lack of interest in other hobbies, and withdrawal symptoms such as rage, anger, and physical outbursts, depression, anxiety, damage to interpersonal relationships, and significant decline in academic performance, which resulted in academic dismissal.

462.    Each Defendant's actions and omissions as alleged in this Complaint were intentional, oppressive, malicious, reckless, wanton, fraudulent, beyond all standards of decency, and without regard for human life or Plaintiff's rights, thereby warranting the imposition of punitive damages. Thus, Plaintiff seeks actual and punitive damages according to proof.

## COUNT X – PUNITIVE DAMAGES

**(Against All Defendants)**

-63-
**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

463. Plaintiff realleges and incorporates by reference all the foregoing allegations as if repeated in full here.

464. Plaintiff alleges that Defendants' conduct was undertaken with malice, oppression, or fraud, as described in California Civil Code § 3294.

465. More specifically, Defendant willfully and consciously disregarded the safety and rights of others, engaged in intentional misrepresentation, and conducted themselves in a despicable manner, with knowledge that such acts would likely cause injury, by implementing subversive operant conditioning behavior modification systems while failing to provide:

    a.   warnings of the use of operant conditioning behavior modification systems;

    b.   fully informed consent to operant conditioning behavior modification systems;

    c.   robust age verification mechanisms;

    d.   effective parental controls;

    e.   removal of barriers to the enactment of parental controls;

    f.   warnings as to the health effects of use and extended use upon sign-up;

    g.   opt-in restrictions to the length and frequency of sessions;

    h.   self-limiting tools, including but not limited to session time notifications, warnings, or reports.

    i.   tools to restrict and/or block usage during certain times of day (such as during school hours or late at night);

    j.   self-imposed limits for microtransactions; and

    k.   others as set forth herein.

466. As a direct and proximate result of Defendants' egregious conduct in prioritizing profits at the expense of minors with knowledge of the attendant risks and their failure to mitigate those risks, Plaintiff is entitled to an award of exemplary and punitive damages in an amount sufficient to punish Defendants and deter similar conduct in the future. Accordingly, Plaintiff requests punitive damages as permitted by law.

## XI.  **PRAYER FOR RELIEF**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

WHEREFORE, Plaintiff Rudy McWilliams, for the stated causes of action, prays for judgment against each Defendant as follows:

i.    For damages to be determined by the jury, in an amount exceeding the minimum jurisdictional requirement of this Court, and adequate to compensate Plaintiff for all injuries and damages sustained;

ii.   For all general and special damages caused by the conduct of the Defendants;

iii.  For the costs of litigating this case;

iv.   For all pre-judgment and post-judgment interest;

v.    For Plaintiff's costs of suit herein;

vi.   For injunctive relief;

vii.  For attorneys' fees;

viii. For exemplary and/or punitive damages according to proof at the time of trial; and

ix.   For such other and further relief, whether at law or in equity, to which this Court deems just and proper.

Date: April 7, 2026

**PARAFINCZUK WOLF, P.A.**


By: *John A. Bruegger*
    John A. Bruegger, Esq. (SBN: 250494)
    Justin R. Parafinczuk (*PHV forthcoming*)
    1 Sansome Street, Suite 1400
    San Francisco, CA 94104
    Tel.: (954) 462-6700
    Fax: (954) 462-6567
    jbruegger@parawolf.com
    jparafinczuk@parawolf.com
    vga@parawolf.com

    *Counsel for Plaintiff Rudy McWilliams*

-65-

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**